UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

In re                                                    Chapter 11

SOLUTIA, INC., ET AL.,                                   Case Nos. 03-17949 (PCB)
                                                         (Jointly Administered)

                    Debtors.

------------------------------------------------------x

WILMINGTON TRUST COMPANY,
AS SUCCESSOR INDENTURE TRUSTEE
TO JPMORGAN CHASE BANK, N.A.                             Adv. Pro. No. 05-01843

                    Plaintiff,

                    -against-

SOLUTIA INC.,

                    Defendant.

------------------------------------------------------x

APPEARANCES:

REED SMITH LLP.                                   KIRKLAND & ELLIS LLP.
Attorneys for Wilmington Trust Company            Attorneys for Debtor
599 Lexington Avenue                              200 East Randolph Drive
New York, NY 10022                                Chicago, IL 60602
By: Jonathan Young, Esq.                          By: David J. Zott, Esq.
    Eric Schaffer, Esq.                               Thomas L. Campbell, Esq.
    Robert Shenfeld, Esq.                             Jeffrey J. Zeiger, Esq.
    Andrew L. Morrison, Esq.                                   and
                                                  153 East 53rd Street
                                                  New York, NY 10022
                                                  By: Jonathan S. Henes, Esq.

HANNIGAN BENNET & DORMAN, LLP.                    BROWN RUDNICK HAUER & FELD, LLP.
Attorneys for Ad Hoc Committee                    Attorneys for Ad Hoc Committee
   of Noteholders                                    of Trade Creditors
865 South Figeroa Street                          One Financial center
Los Angeles, CA 90017                             Boston, MA 02111
By: Bennett J. Murphy, Esq.                       By: James W. Stoll, Esq.
    Bruce Bennett, Esq.                               Stephen D. Pohl, Esq.
    Michael Heyman, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP.
Attorneys for Official Committee
    of Unsecured Creditors
590 Madison Avenue
New York, NY 10022
By: Daniel H. Golden, Esq.
Ira S. Dizengoff, Esq.
      and
1111 Louisiana Street
Houston, TX 77002
By: S. Margie Venus, Esq.
    Ann Stephens, Esq.

<u>MEMORANDUM DECISION AFTER TRIAL</u>

BEATTY, Prudence Carter, U.S.B.J.

      The resolution of this adversary proceeding affects the plan process. If, as the
Noteholders assert, they should be treated as secured creditors, the amount available for distribution
to unsecured creditors will be diminished. The claim of the Noteholders to secured status rests on
their assertion that the Debtor improperly caused the release of an "equal and ratable lien" the
Noteholders held until October 8, 2003, about ten weeks before these chapter 11 cases were filed.
On October 8, the Debtor entered into a new loan agreement with new lenders that reduced the total
amount of its secured borrowing to an amount below the threshold needed to trigger the "equal and
ratable lien" provisions set forth in the controlling Indenture.

      The Noteholders urge that the Debtor, by entering into the new loan agreement on
terms which released the Noteholders' equal and ratable lien, should not be permitted to deprive
them of their secured status because it would, *inter alia*, violate the covenant of good faith and fair
dealing implicit in all contracts. The Debtor, which relied on a plain and literal reading of the
Indenture, responds that it exercised its rights under the Indenture in a way that furthered its
perceived best business interests and did not breach of the implied covenant of good faith and fair

2

dealing. The Debtor urges that none of the other arguments proffered by the Noteholders warrant the granting of secured status to the Notes. Thus, Debtor submits, this Court should determine that the Notes were properly de-secured and that the Noteholders hold unsecured claims.

Based on the witnesses heard and the evidence presented at trial, the Court makes its findings of fact and conclusions of law which follow. The Court holds that the Noteholders do not have, and are not entitled to, an equal and ratable lien on any of the Debtor's assets.

## BACKGROUND

Solutia, Inc. (the "Debtor"), a Delaware corporation, filed its voluntary chapter 11 petition on December 17, 2003 (the "Filing Date").[1] The Debtor is a multinational organization which has been a world leader in the development, manufacture and application of performance films, chemical products, nylon products and pharmaceuticals. *See ¶ 4, Affidavit and Decl. of Jeffry N. Quinn in Support of Chapter 11 Petitions and Requests for First Day Relief pursuant to Local Bankruptcy Rule 1007-2, attached as Exhibit A to the Decl. of Lawrence P. Biondi* (hereinafter, the "*Quinn Decl.*"). On the Filing Date, the Debtor operated 29 manufacturing plants worldwide, including 18 sites in North America, 10 sites in Western Europe and 1 in South America, and had sales offices, research laboratories and technical centers around the globe.

The Debtor was spun off in 1997 from what was then known as Monsanto Company ("Old Monsanto"). The Debtor was capitalized with $450 million in long term notes issued under

---

[1] Fourteen of the Debtor's American affiliates filed Chapter 11 petitions at the same time. Those cases are being jointly administered with the Debtor's case. The Debtor has several European and other affiliates that are not Chapter 11 debtors. For ease of reference, the term "Debtor" will be used as an inclusive term meaning Solutia and, as the context requires, its filing and non-filing affiliates.

an Indenture dated as of October 1, 1997 (the "Indenture").  *See DX* 1 and  *PX* 3.[2]  The Indenture

is governed by the laws of the State of New York.  *Indenture* at §112. Wilmington Trust Company

is the current indenture trustee (the "Indenture Trustee").  Pursuant to the Indenture, the Debtor

issued two series of notes: (a) $150 million in 6.72% notes due October 15, 2037 and (b) $300

million in 7.375% notes due October 15, 2027 (collectively, the "Notes," the holders of the Notes

being defined herein as the "Noteholders").  Both series of Notes are publicly traded.

The Notes were unsecured debt when issued.  Section 1008 of the Indenture (the

"Equal and Ratable Clause")[3] provides, however, that if the Debtor incurs debt secured by specific

collateral that exceeds 15 percent of its Consolidated Net Tangible Assets, as defined in the

Indenture ("CNTA")[4], the Notes obtain an "equal and ratable" security interest (the "Equal and

Ratable  Lien").

The Notes remained unsecured from when they were issued in October 1997 until

July 2002 when the Debtor refinanced its original credit facility which was set to expire that August.

The Debtor had expected to be able to obtain a new loan with new lenders on better terms than it

---

[2]  The Debtor's trial exhibits are defined as "DX__" and the Indenture Trustee's trial exhibits
are defined as "PX__."

[3]  The Equal and Ratable Clause states:

"The Company will not * * * create * * * indebtedness * * * ("Debt"), secured by
* * * any Principal Property * * * or * * * any shares of stock or Debt of any
Restricted Subsidiary * * * without effectively providing that the Securities * * *
shall be secured equal and ratably with (or prior to) such secured Debt * * * so long
as such secured Debt shall be so secured, unless after giving effect thereto, the
aggregate principal amount of all such secured Debt then outstanding * * * would
not exceed an amount equal to 15% of Consolidated Net Tangible Assets." *Indenture*
at §1008.

[4]  CNTA is defined in *Indenture* §101.  All defined terms in the Indenture are incorporated
herein by reference and are capitalized without further definition in this decision.

4

received under its original credit facility. The Debtor was unable to do so for several reasons, not least of which was the September 11, 2001 terrorist attacks which resulted in the cancellation of the meeting with its banks which had been planned for September 14. *Trial Testimony of Robert Clausen*, former CFO and former Vice Chairman of the Board of Directors of the Debtor, 6/16/06 Transcript ("Tr.") at 897, 899,1014-16. The financial markets essentially shut down after 9/11. The national economy also slowed. In addition, business conditions for the Debtor became unfavorable when the Debtor's costs for key raw materials skyrocketed. *Id.* at 899, 902-05. As the existing credit facility's August 2002 expiration date loomed, the Debtor began planning for a bankruptcy filing in the event that it could not refinance and engaged Kirkland & Ellis as reorganization counsel and Rothschild, Inc. ("Rothschild") as financial advisor. *Trial Testimony of Todd Snyder*, lead investment banker for Rothschild, Inc. 6/19/06 Tr. at 1109-10; *DX 27: Rothschild Case Study*.

On July 25, 2002 the Debtor and its lenders amended the original credit facility (the "Amended Credit Facility"). *PX 74: Second Amended and Restated Credit Agreement dated as of July 25, 2002*. The Debtor obtained the amended financing on less favorable terms than the original financing. Particularly troublesome from the Debtor's point of view was that the Amended Credit Facility required the Debtor to provide collateral in addition to that pledged under the original facility even though it reduced the maximum amount the Debtor could borrow to $600 million from the $800 million provided in the original facility. As a result of the pledge of the additional collateral in the Amended Credit Facility, the Indenture's Equal and Ratable Clause was triggered and the Debtor became obligated to provide the Noteholders with Equal and Ratable Liens. *Trial Testimony of Jeffry N. Quinn,* current President/Chief Restructuring Officer and former General

Counsel of the Debtor, 6/8/06 Tr. at 450-452, 5/24/06 AM Tr. at 46-47; *Trial Testimony of John Hunter,* former Chairman and CEO of the Debtor, 6/13/06 Tr. at 716-718.

Contemporaneously and as part of the Amended Credit Facility, the Debtor and the lenders entered into the *Intercreditor and Collateral Trust Agreement* (the "Intercreditor Agreement") on July 25, 2002. *DX* 4; *PX* 4. The Intercreditor Agreement, which is also governed by New York law, provided, *inter alia,* the mechanism under which the Debtor was to fulfill its obligation under Indenture's Equal and Ratable Clause to provide the Equal and Ratable Liens.[5] The Intercreditor Agreement specifically states that "[t]his Agreement is intended to comply with the provisions of the [Indenture] to secure the unpaid principal of, premium, if any, and accrued interest on the Senior Notes equally and ratably with the Credit Agreement Obligations in respect of the Shared Property." *Intercreditor Agreement* at § 8.01. It further states that "at any time during which, to the actual knowledge of any Responsible Officer of the Collateral Trustee, no Triggering Event has occurred and is continuing, the [Equal and Ratable] Lien * * * may, at any time, be released in whole or in part by the Collateral Trustee pursuant to written directions signed by the Collateral Agent * * *. No such release shall require any consent or approval by any other Sharing Security Party." *Id*. at § 7.02(a).

Section 3.04(a) of the Intercreditor Agreement provides that upon becoming aware of the occurrence of any Triggering Event under the Intercreditor Agreement, the "Collateral Agent or any Indenture Trustee, as applicable, shall promptly give written notice thereof to the Collateral Trustee, and the Collateral Trustee, upon receipt of such notice, shall promptly notify the * * *

---

[5] Although the Indenture Trustee was not a party to the Intercreditor Agreement, it is clear that it was an intended beneficiary.

Indenture Trustee * * * that a Triggering Event has occurred." *Id.* at § 3.04. The Intercreditor

Agreement defines a "Triggering Event" as, *inter alia,* the occurrence of any Event of Default under

the 1997 Indenture and as the occurrence of a Bankruptcy Event under the Intercreditor Agreement.

*Id.* at §1(a), p. 11. The Intercreditor Agreement defines a Bankruptcy Event as the institution of any

proceeding by or against the Debtor "seeking to adjudicate it a bankrupt or insolvent, or seeking *

* * winding up, reorganization, arrangement, adjustment, protection, relief * * *  under any law

relating to bankruptcy, insolvency or reorganization * * * or  [the Debtor taking] **any corporate**

**action** to authorize any of the actions set forth above." *Id. at* §1(a), p.3.  (emphasis added).  A

Bankruptcy Event, as defined in the Intercreditor Agreement, also includes an Event of Default as

defined in the Indenture. *Id.*

      Section 501 of the 1997 Indenture contains the Event of Default clauses referred to

in the Intercreditor Agreement.  In particular, the Indenture includes as an Event of Default:

> "* * * the Commencement by the Company of a voluntary case or
> proceeding under any applicable Federal or State bankruptcy,
> insolvency, reorganization or other similar law * * * or the consent
> by it to the filing of such petition * * * or the admission by it in
> writing of its inability to pay its debts  generally as they become due,
> **or the taking of corporate action by the Company in furtherance**
> **of such action** * * *." *Indenture* at § 501(6) (emphasis added).

The Amended Credit Facility resolved the Debtor's immediate financial crisis.  By

the Spring and Summer of 2003 the Debtor again began to experience pressing liquidity problems.

It again retained reorganization counsel and financial advisors.  A major cause of concern arose from

the so-called legacy liabilities the Debtor assumed when it was spun off from Old Monsanto in 1997.

      Old Monsanto was originally a chemical company, which, over the course of the 20th

century, grew into a highly successful global enterprise that also manufactured agricultural products,

pharmaceuticals and food ingredients. In early 1997, Old Monsanto decided to get out of the chemical business and determined to create and spin off the Debtor to take over its assets and liabilities. The spin off occurred in September 1997 and the Debtor became a publicly traded company.[6] Upon the spin off, the Debtor assumed financial responsibility for, and was required to indemnify Old Monsanto against, essentially all of the liabilities created by the long term operation of Old Monsanto's chemical business (the "Legacy Liabilities"). *Id.* The Legacy Liabilities assumed by the Debtor included significant environmental claims and encompassed liabilities for sites the Debtor never owned or operated. The Legacy Liabilities also included healthcare, life and disability insurance and pension costs for Old Monsanto's former employees. *Quinn Decl.* at ¶¶ 54-58; *DX* 18: *Debtors' Securities and Exchange Commission* ("SEC") *Form 10-Q Quarterly Report* ("Form 10-Q") *for the period ended June 30, 2003* at 32.

Among the most pressing Legacy Liabilities in the Spring and Summer of 2003 were state and federal lawsuits in Alabama involving approximately 20,000 plaintiffs. Those plaintiffs claimed injuries resulting from the manufacture and discharge of PCBs over many years from the Anniston, Alabama plant which the Debtor had inherited from Old Monsanto (the "Anniston

---

[6] On December 1999, Old Monsanto was acquired by Pharmacia & Upjohn, Inc. ("P&U"). The acquisition was effected by a merger of Old Monsanto and P & U whereby P & U became a wholly owned subsidiary of Old Monsanto. On February 9, 2000, Old Monsanto formed a new subsidiary, to operate Old Monsanto's agriculture business, which it called Monsanto AG Company. On March 31, 2000, Old Monsanto changed its name to Pharmacia Corporation ("Pharmacia") and Monsanto AG Company changed its name to Monsanto Company ("New Monsanto"). In September 2000, New Monsanto agreed to indemnify Old Monsanto, now known as Pharmacia, against the so-called Legacy Liabilities. On August 13, 2002. Old Monsanto/Pharmacia, spun off its interest in New Monsanto and New Monsanto became an independent publicly owned company. New Monsanto apparently In April 2003, Old Monsanto/Pharmacia was acquired by Pfizer, Inc. and is now a wholly-owned subsidiary of Pfizer, Inc. *Quinn Decl.* at ¶¶ 15-21.

Litigation").[7]  *Quinn Testimony*, 5/31/05 Tr. at 39, 48.  In Spring 2003, the jury in the state court

lawsuit began returning property damage verdicts, with $11.8 million awarded to the first 51

plaintiffs. *DX* 17: *Debtors' SEC Form 10-Q for the Quarter ended March 31, 2003* at 22.  Based on

the initial awards in the state court case, which did not include personal injury or punitive damages,

the Debtor concluded that its potential exposure could approach $3 billion and threaten its very

existence.  *Form 10-Q dated as of June 30, 2003 at* 12, 32*; Quinn Testimony*, 5/31/05 Tr. at 42, 74-

75.  The Debtor again began actively considering restructuring options.  It also commenced

discussions with New Monsanto and Pharmacia about potential contributions to any settlement of

the Anniston Litigation.  *Quinn Testimony*, 5/31/05 Tr. at 55.

At its April 23, 2003 Board of Directors meeting, John Hunter, the Debtor's then-

Chairman and CEO, had presented a strategy of pursuing various restructuring alternatives on a

"parallel path." *DX* 29: *Minutes of April 23, 2003 Board of Directors Meeting*.  Hunter testified at

trial that his preferred path was an out of court restructuring with New Monsanto, Pharmacia and

other constituents because it maximized the value for the benefit of all stakeholders.  *Hunter*

*Testimony*, 5/31/06 Tr. at 63-64; *see also Quinn Testimony*, 5/31/06 Tr. at 63-64.  Only if an out of

court restructuring could not be achieved, he testified, was the Debtor willing to consider filing a

bankruptcy. *Hunter Testimony*, 6/13/06 Tr. at 732-33.  The settlement of the Anniston Litigation

would be a key element if there were any hope for an out of court restructuring. *Id*. at 746.  Based

on the amounts of the early awards in the state court case, the Debtor was concerned that adverse

rulings in the federal court case, scheduled to begin trial in the Fall of 2003, would be

---

[7]  The Anniston plant is a facility which the Debtor owned and operated after the spin off,
although it never produced PCBs.

9

insurmountable. *April 23, 2003 Board Minutes; Hunter Testimony*, 6/13/06 Tr. at 733; *Quinn Testimony*, 5/31/06 Tr. at 95; *Form 10-Q dated as of June 30, 2003* at 13.

By early August 2003, it appeared unlikely to the Debtor that the Anniston Litigation could be successfully settled. *DX 70: Memorandum from Quinn to Restructuring Team dated August 6, 2003*. In addition to negotiating a settlement with the Anniston Litigation plaintiffs, the Debtor knew that it would also have to negotiate an agreement for New Monsanto to fund any settlement because the Debtor did not have the substantial funds necessary to do so itself. The Debtor believed that New Monsanto would balk at providing a meaningful contribution towards a settlement. *Quinn Testimony*, 5/31/06 Tr. at 69-72, 94-95; *Hunter Testimony* 6/13/06 Tr. at 751-52. The Debtor therefore accelerated its preparation for a possible bankruptcy filing. *Id.* On August 12, 2003, Quinn, wrote to New Monsanto's General Counsel, Charles Burson, and its Chief Financial Officer, Terry Crews, to encourage New Monsanto's participation in the settlement of the Anniston Litigation as an act of "enlightened self interest." *DX 73: E-mail from Quinn to Burson and Crews dated August 12, 2003.* Quinn emphasized that significant Legacy Liabilities would come back to New Monsanto if the Debtor filed for bankruptcy, but that settlement of the Anniston Litigation opened the door for an out of court restructuring of the Debtor. *Id.*

Despite the Debtor's trepidations, New Monsanto did agree to fund the bulk of the settlement of the Anniston Litigation. On August 20, 2003, the Anniston Litigation was settled for $600 million (the "Anniston Settlement"), with New Monsanto contributing $550 million, $390 million of which was out of pocket and $160 million from insurance. The Debtor agreed to pay $50 million in ten equal installments beginning in August 2004. *DX 19: Press Release dated August 20, 2003.* As part of the Anniston Settlement, New Monsanto received warrants to purchase 10 million

10

shares of the Debtor's common stock.  *Snyder Testimony*, 6/9/06 Tr. at 1119-20; *DX* 40:  *Minutes of August 18, 2003 Board of Directors Meeting*.  Pharmacia contributed certain community health benefits to the Anniston Settlement. *Debtor's Press Release dated August 20, 2003*.

New Monsanto's willingness to fund the majority of the Anniston Settlement gave the Debtor's management the belief that an out of court restructuring of the Debtor was possible. *Snyder Testimony*, 6/9/06 Tr. at 690-91; 6/19/06 Tr. at 1119-20;  *Trial Testimony of Eric Siegert, Senior Managing Director of Restructuring at Houlihan Lokey Howard & Zukin ("Houlihan Lokey"), financial advisor to the informal noteholders committee, 6/14/06 Tr. at 853-54.*[8]  The Debtor determined that replacing the Amended Credit Facility was necessary as part of its plan to achieve an out of court restructuring.  The Debtor's desire to replace the Amended Credit Facility was based on many factors.  First, the Amended Credit Facility was perceived as interim financing which had been obtained on less than favorable terms. *Clausen Testimony*, 6/16/06/ Tr. at 909. Second, the Amended Credit Facility was over-secured. Under the original credit facility, the Debtor provided collateral sufficient to borrow $800 million.  Although the Amended Credit Facility reduced borrowing capacity to $600 million, the Debtor had had to provide sufficient additional collateral to obtain the smaller facility that it triggered the Equal and Ratable Clause, which significantly increased the overall amount of the Debtor's secured debt. *Snyder Testimony*, 6/19/06 Tr. at 634-35; *Hunter Testimony*, 6/13/06 Tr. at 773; *Clausen Testimony*, 6/16/06/ Tr. at 937-38. Third, the Debtor could no longer comply with the financial covenants in the Amended Credit

---

[8]Even though the Debtor's management was optimistic that an out of court restructuring was possible, on August 21, 2003 the Debtor incorporated a new shell subsidiary, Solutia Business Enterprises, Inc. ("SBE") as a New York corporation.  *PX* 189: *Certificate of Incorporation* dated June 20, 2006.  The apparent purpose of incorporating SBE was to provide venue in this District.

Facility and had continuously needed to pay to obtain default waivers.[9]  *Id.* at 936; *Hunter Testimony*, 6/13/06 Tr. at 772-73; *Snyder Testimony*, 6/19/06 Tr. at 1174-75.  Fourth, the Amended Credit Facility was scheduled to expire in August 2004. *Testimony of Paul Hatfield*,  member of the Debtor's Board of Directors, 6/2/06 Tr. at 64; *Quinn Testimony*, 6/8/06 Tr. at 403-03.

Quinn testified that refinancing the Amended Credit Facility allowed the Debtor to structure the replacement facility so that it did not trigger the Equal and Ratable Clause, thereby returning the Notes to their original unsecured status. *Quinn Testimony*, 6/8/06 Tr. at 458-59; *see also Snyder Testimony*, 6/9/06 Tr. at 589-91, 6/29/06 Tr. at 1355-56.  The Debtor and its  advisors believed that releasing the Equal and Ratable Liens would provide the Debtor with additional "flexibility for a potential [out of court] restructuring" and give New Monsanto and the Noteholders "an incentive to complete an out of court deal." *Hatfield Testimony*, 6/2/06 Tr. at 154-55; *Snyder Testimony*, 6/19/06 Tr. at 1088-89.  At the August 13, 2003 Board of Directors meeting, the Debtor's restructuring counsel advised that the release of the Equal and Ratable Liens would be "a result of the mechanical application of the terms of the Indentures." *See DX:* 40 *Minutes of August 13, 2003 Board of Directors Meeting.*  One aspect of the collateral restructuring was the replacement of liens with a letter of credit to cover the Debtor's obligations in its Astaris joint venture with FMC Corporation ("FMC").[10]

---

[9] Whether or not the cost of the default waivers was outweighed by the costs of the facility fees for the new loan, this Court concludes that the Debtor found it distasteful and somewhat unsettling to be constantly on the asking end of the equation with its lenders.

[10]Astaris was a 50/50 joint venture between the Debtor and FMC to manufacture and sell phosphorous chemicals, phosphate salts and phosphoric acid used in foods, cleaners, water treatment and pharmaceuticals.  When Astaris was formed, the Debtor and FMC contractually agreed with Astaris' lenders to provide Astaris with funding in the event the joint venture failed to meet certain financial benchmarks (the "Keepwell Payments").  As a result of Astaris' financial shortfalls, the Debtor and FMC were required to make Keepwell Payments of $47 million during the nine month

The Debtor received proposals for the new credit facility from Abelco Finance LLC. ("Abelco"), among others. Abelco's proposed financing provided for a three year loan with a borrowing base of $350 million and a collateral package that would not trigger the Equal and Ratable Clause. *Quinn Testimony*, 5/24/06 AM Tr. at 55; *DX* 40A: *Rothschild Discussion Materials dated August 18, 2003* at 6-7.

Todd Snyder of Rothschild, the Debtor's financial advisor, presented the Board with the terms of the Abelco proposal at the September 15, 2003 Board of Directors meeting. *DX* 42, *PX* 66: *Minutes of September 15, 2003 Board Of Directors Meeting (the "September 15 Minutes"), Exhibit A, Term Sheet*. Snyder stressed the importance of reducing the amount of the Debtor's secured debt in either an out of court or in court restructuring.[11] The Term Sheet distributed to the Board stated that the loan collateral "shall secure indebtedness under the Financing Facility in the maximum aggregate amount that would not require that such lien and security interest be granted to, and shared equally and ratably with, the holders of the existing notes and debentures of the Companies." *Id*. Snyder stated that "it was his opinion that the financing as proposed was the best available, and perhaps only available, financing for the Company at [that] time." *Id*.

The September 15 Minutes further reflect that the Debtor's new restructuring attorneys, Richard Cieri and his partner, Conor Reilly of Gibson Dunn & Crutcher LLP. ("Gibson

---

period ended September 30, 2003. *Quinn Decl*. at ¶ 43. The maximum remaining required Keepwell Payments under the original credit facility were projected to be approximately $134 million, to be shared equally between the Debtor and FMC. *Id*. The Amended Credit Facility replaced the Astaris bank liens with a $67 million letter of credit. *Quinn Decl*. at ¶ 44.

[11]  Mr. Snyder's presentation materials suggest that he, and probably Mr. Quinn, had little confidence that a bankruptcy filing, whether pre-packaged or not, could be avoided. In particular, Mr. Snyder's presentation materials included numerous references to the prospective need for an additional $150 million borrowing in the near term as well as to bankruptcy scenarios.

Dunn") advised "that consummation of the proposed financing was consistent with the Board's fiduciary duties and that it was appropriate for the Board to rely on the advice of counsel in that regard." *Id*. In response to a question posed by a Board member, Mr. Cieri stated that "the fact that the financing would result in certain indebtedness of the Company that originally been issued as unsecured debt, but which had subsequently become secured as a result of an equal and pro-rata lien provision contained in certain of the Company's indentures, once again becoming unsecured, was not a breach of the director's fiduciary duties." *Id*. In response to another question, Mr. Reilly gave the Board his legal opinion "that it was appropriate for the Board to review the summary terms of the financing as reflected in the documentation made available to the Board, and that the Board did not need to review the actual financing documents in order for it to fulfill its fiduciary duties and that the authorization of management to consummate the financing in accord with such terms was consistent with the Board's fiduciary duties." *Id*. After receiving the advice of the Debtor's financial advisors and the assurance of its legal counsel, the Board authorized the Debtor to enter into a three year, $350 million revolving credit facility with Abelco (the "Abelco I Loan"). *Id.*

On October 8, 2003, the Debtor closed on the Abelco I Loan, the proceeds of which were partially used to retire the Amended Credit Facility as well as to establish the Astaris letter of credit. The Abelco I Loan was secured by liens on the Debtor's working capital assets and some plant, property and equipment assets, but it was not secured by all of the assets that had been pledged under the Amended Credit Facility (the "Unliened Assets"). The release of the security interests in the Unliened Assets had the effect of reverting approximately $680 million of the

14

Debtor's outstanding secured debt to unsecured debt by operation of the Equal and Ratable Clause.[12]

*Quinn Decl.* at ¶ 51.   In connection with the closing of the Abelco I Loan, Debtor's counsel issued a formal opinion letter to the Collateral Trustee concluding that the release complied with "[a]ll conditions precedent contained in the Indenture." *See DX* 95: *Opinion Letter of Gibson Dunn* (the "Gibson Dunn Opinion Letter").  The Debtor provided the Collateral Agent with a written officer's certificate directing the Collateral Agent to direct the Collateral Trustee to release the Equal and Ratable Liens.   *DX* 8: *Written Direction of Collateral Agent pursuant to § 7.02(a) of the Intercreditor Agreement; DX 9: Officer's Certificate pursuant to § 12.04 of the Indenture*; *DX* 10: *Letter to Indenture Trustee Re: Release of Collateral*.  The day after the Abelco I Loan closed, the Debtor issued a press release stating that the Equal and Ratable Liens had been released.  *See DX* 21: *Press Release dated October 9, 2003*.  Less than a week later, the Debtor filed a Form 8K with the SEC attaching the press release, and sent a copy to the Indenture Trustee.  *Id*.  Although the Debtor had closed on the Abelco I Loan, it continued negotiating with Abelco for possible additional financing if it proved necessary.  During these negotiations, Abelco confirmed to the Debtor that any subsequent financing would be available on either an out of court or an in court basis.  *DX 86, PX 22: E-mail from Gibson Dunn dated September 24, 2003; accord, DX 50: E-Mail re: "Step II Term Sheet" dated October 20, 2003*; *Quinn Testimony*, 5/31/06 Tr. at 196-97.  However, there was no firm commitment by Abelco to make any further loan.  *Quinn Testimony*, 5/31/06 Tr. at 195.

Even though the Debtor had settled the Anniston Litigation and closed on the Abelco I Loan, it continued contingency bankruptcy planning in case the out of court restructuring effort

---

[12] The balance of the debt that reverted to unsecured status were certain European notes, as hereinafter defined.  *See* Footnote 14.

was ultimately unsuccessful. *Quinn Testimony*, 5/24/06 AM Tr. at 103-04; *Clausen Testimony*, 6/16/06 Tr. at 952. A major cause of the Debtor's concern was whether New Monsanto would be willing to provide further financial assistance to the Debtor. Quinn and Clausen's testimony at trial reflected the then optimistic belief of the Board and at least some of the Debtor's senior management that an out of court restructuring could be achieved based on New Monsanto's track record of providing the Debtor with financial assistance at key moments. *DX* 39: *Minutes of August 5, 2003 Board of Directors Meeting*; *DX* 40, *PX* 23: *Minutes of August 18, 2003 Board of Directors Meeting*; *Clausen Testimony*, 6/16/06 Tr. at 917; *Quinn Testimony*, 6/7/06 Tr. at 359-60; *Hunter Testimony*, 6/13/06 Tr. at 769. Their optimism was apparently confirmed when, shortly after the Board approved the Abelco I Loan, New Monsanto made a $25 million prepayment in connection with an amendment of its raw materials contract with the Debtor. *DX* 88: *Second Amendment to Raw Materials Purchase Agreement between the Debtor and New Monsanto dated September 26, 2003*.

Soon after the Abelco I Loan closed, the Debtor scheduled a meeting with New Monsanto to discuss an out of court restructuring. The meeting, at which New Monsanto's CEO participated, was held on October 13, 2003. *Quinn Testimony*, 6/7/06 Tr. at 289. At this meeting, the Debtor asked New Monsanto for a 90-day "holiday" from the Debtor's indemnification obligations for various Legacy Liabilities. The Debtor hoped that this "holiday" would give it time to approach the Noteholders and negotiate a consensual restructuring of the Notes. *Id*. at 290; *DX* 97: *E-mail from Quinn to Cieri dated October 16, 2003*; *DX* 105: *E-mail from Snyder to Cieri, Reilly, Hunter and Clausen dated October 23, 2003*. New Monsanto rejected the "holiday" request outright. *Quinn Testimony*, 5/31/06 Tr. at 134, 6/7/06 Tr. at 290; *Hunter Testimony*, 6/13/06 Tr. at 801-02. Hunter testified that the Board and the Debtor's management believed that although New

Monsanto unequivocally rejected the Debtor's request, New Monsanto's harsh negotiating position would ease and the request would be honored in some fashion because New Monsanto was considered an "11:59 p.m company." *Hunter Testimony*, 6/13/06 Tr. at 712-13; *see also Hatfield Testimony*, 6/2/06 Tr. at 13-14; *Quinn Testimony,* 6/7/06 Tr. at 294-95.

Despite the October 8 de-securitization of the Notes, a week later on October 15, 2003, the Debtor timely made a $16.1 million interest payment due to the Noteholders. Eric Siegert, the financial advisor to the informal noteholders committee, testified that it would not have made sense for the Debtor to make this payment if it did not intend to restructure out of court. *Siegert Testimony*, 6/14/06 Tr. at 835. On October 16, 2003, the Debtor issued a press release which stated that the Debtor intended to commence discussions with the Noteholders to restructure the Notes. *Siegert Testimony*, 6/14/06 Tr. at 837; *DX* 22, *PX* 22: *Press Release dated October 16, 2003*.[13] As a result of the press release, an informal noteholders committee was formed (the "Informal Committee"). The Informal Committee retained legal and financial advisors, commenced due diligence regarding the Debtor and New Monsanto, and spoke with New Monsanto's advisors. *Siegert Testimony*, 6/14/06 Tr. at 847-51, 855; *DX* 114: *Houlihan Lokey Retention Agreement*. Based on its review, the Informal Committee's financial advisor concluded that the Debtor could be restructured out of court. *Siegert Testimony*, 6/14/06 Tr. at 852.

By October 29, 2003, Rothschild had prepared a summary proposal that outlined a potential exchange offer for the Noteholders. *DX* 110: *Rothschild Alternative Discussion Materials.* However, when Quinn met with New Monsanto's general counsel, Charles Burson on October 29,

---

[13] This press release also announced Quinn's assumption of the role of Chief Restructuring Officer. Quinn had been the Debtor's general counsel.

Burson stated that New Monsanto would not participate in three-way negotiations involving New

Monsanto, the Debtor and the Noteholders. *DX* 109: *E-mail from Quinn to Snyder dated October*

*29, 2003*. On November 18, 2003, Quinn e-mailed Burson to advise him that the Debtor and the

Noteholders were making progress on an out of court restructuring and that the Debtor would have

a proposal to discuss with New Monsanto in the following weeks. *DX* 115: *E-mail from Quinn to*

*Burson dated November 18, 2003*. In early December 2003, New Monsanto expressed interest in

meeting with the Informal Committee. *Quinn Testimony* 6/07/07 Tr. at 307-311. The Debtor

proposed the date of December 12, 2003 for the meeting. *DX* 123: *E mail from Quinn to Burson*

*dated December 4, 2003*; *Quinn Testimony* 6/7/07 Tr. at 314.

Ten days before that meeting was to take place, on December 2, 2003, the Debtor

notified New Monsanto that it would not make a $3 million Legacy Liability payment then due.

*Hunter Testimony*, 6/13/06 Tr. at 804-07. It was at this point that things spun out of control. There

is nothing in the record to suggest that at the time the Debtor decided not to make the payment to

New Monsanto, that it lacked the funds to do so. Apparently the Debtor believed that its action

would further the negotiations with New Monsanto. Instead, its decision had the opposite effect.

New Monsanto stated that it would not negotiate until the payment was made. *DX* 126: *Letter from*

*New Monsanto and Pharmacia to Quinn dated December 8, 2003*. Hunter told New Monsanto's

representatives that if New Monsanto did not contribute to the Debtor's out-of-court restructuring

efforts, the Debtor would file for bankruptcy. *DX* 127: *E-mail from Quinn to Burson dated*

*December 8, 2003*. At its December 16, 2003 Board Meeting, the Debtor was advised by its

attorneys that New Monsanto would not reconsider and that instead, New Monsanto was considering

the filing of an involuntary chapter 11 action against the Debtor. *DX* 48: *Minutes of December 16,*

*2003 Board of Directors Meeting  ("December 16, 2003 Board Meeting").*  After much discussion, the Board authorized  the voluntary filing of the Chapter 11 petitions.[14]  *Id.*  The Debtor filed the next day.  Two days later, on December 19, 2003, the Debtor entered into an interim debtor-in-possession financing agreement with Abelco (the "Abelco II Loan"), which provided the Debtor with interim post-petition financing in the total amount of $515 million, including the original $350 million, secured by an enhanced collateral package that would, absent bankruptcy, have triggered the Equal and Ratable Clause.  The Noteholders objected to the Abelco II Loan and their rights were preserved.  Ultimately, on January 16, 2004, the Debtor obtained DIP financing from Citibank N.A.  *DX* 13: *Financing Agreement among the Debtor, SBE and Citicorp dated as of January 16, 2004.*  This adversary proceeding was commenced on May 27, 2005.

## DISCUSSION

Despite the pretrial and trial hyperbole, this case involves the relatively simple relationship between a corporation and the holders of its debt securities, which under the law, is contractual in nature.  *See Katz v. Oak Industries Inc.*, 508 A.2d 873, 879 (Del. Ch. 1986).  The

---

[14]  Before the Debtor could file, it needed to prevent, at least temporarily,  its Eurpoean Notes from going into default.  The Debtor was a guarantor of certain notes (the "Euro Notes") issued by non-debtor Solutia Europe SA/NV ("Solutia Europe").  The terms of the Euro Notes provided that a domestic Chapter 11 filing by the Debtor would result in the immediate acceleration of the €200 million outstanding principal amount of the Euro Notes.  Moreover, any European insolvency proceeding would have resulted in the liquidation, not reorganization, of the Debtor's European entities.  Therefore it was critical that the Debtor modify the restrictions in  the Euro Notes prior to a domestic bankruptcy filing.  On December 16, 2003, Solutia Europe held a noteholders meeting pursuant to Article 568 of the Belgian Companies Code, at which the informal committee of Euro Noteholders joined with certain other of Solutia Europe's noteholders to approve resolutions under Belgian law modifying the default and acceleration provisions of the Euro Notes such that the commencement of the Debtor's Chapter 11 case would not constitute a default prior to January 30, 2004.  *Quinn Decl.*  at ¶ 59.

proper resolution of this matter lies in the construction of the Indenture itself once the court winnows

away the extraneous chaff of facts.  As more fully set forth herein, the Court finds that the Debtor,

at the time it did so, had the right under the Indenture to structure its financing so that the amount

of its secured debt did not exceed the agreed upon 15 percent threshold required to trigger the Equal

and Ratable Clause.[15]

There is no dispute that the Debtor did exactly that through the Abelco I Loan.  At

trial, no witness testified otherwise. While the deliberate restructuring of a triggering loan with a

non-triggering one may not have been anticipated by the Indenture Trustee and the Noteholders, the

terms of the contractual relationship agreed to, and not broad concepts such as equity, define the

Debtor's obligations to its Noteholders.  *Id.* at 879.  Under the plain and express terms of the

Indenture, the Noteholders were not entitled to an Equal and Ratable Lien once the amount of

secured debt fell below the prescribed threshold.  The Debtor did not breach any contractual duty

to the Noteholders by entering into a new loan agreement that deliberately de-securitized the Notes.

The Indenture explicitly and unambiguously sets forth the provisions which trigger

the Equal and Ratable Clause:  that the Indenture Trustee will have an Equal and Ratable Lien  so

long as the Debtor's secured debt level exceeds 15 percent of its CNTA  *See* Indenture §1008.  The

Intercreditor Agreement sets out the terms for effectuating the Equal and Ratable Lien.  *See*

Intercreditor Agreement § 8.01.  Under New York law, which governs both the Indenture and the

Intercreditor Agreement, the Court must give effect to the intentions of the parties entering into an

agreement.  *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990); *see also*

---

[15] Every case must be decided on its own facts.  There may be cases where intentional
desecuritization in the face of bankruptcy would be improper.  This case is not one of them.

*Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999).   Where a contract is unambiguous, a court must interpret it as a matter of law.  *Crane* at 757.  Words and phrases must be given their plain meaning and the contract must be construed "so as to give full meaning and effect to all of its provisions."  *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996); *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985), *reh. den.*, 67 N.Y.2d 647, 499 N.Y.S.2d 1031, 490 N.E.2d 558 (1986)("it is axiomatic that a document is to be interpreted so as to give effect to the intent of the parties expressed in the unequivocal language employed.").  Where a contact is unambiguous "a court may neither rewrite, under the guise of interpretation * * * nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case."  *Terwilliger v. Terrwilliger*, 206 F.3d 240, 245 (2d Cir. 2000).

The Indenture was drafted to take a look at a single benchmark.  It states that when over 15 percent of the CNTA are liened, the Equal and Ratable Lien is automatically in place.  It follows, therefore that when less than 15 percent of the CNTA are liened there is no right to an Equal and Ratable Lien.  What goes on without any effort on the part of the Indenture Trustee is lost just as effortlessly when secured borrowing falls below the 15 percent threshold.  The Indenture Trustee's own representative Thomas Foley, a 38 year industry veteran employed by JPMorgan Chase, a predecessor Indenture Trustee, conceded that the release of the Equal and Ratable Liens was "a routine event * * * anticipated by the terms of the [Indenture]."  *Plaintiffs's Post-Trial Binder: Deposition Testimony of Thomas Foley dated April 6, 2006* at 99-100.  He testified that "if the circumstances are right, [the Debtor] decollateralizes * * * the Company is entitled under the terms of its document, to do this, and they did."  *Id.* at 98-100.

**The Implied Covenant of Good Faith and Fair Dealing**

The Indenture Trustee urges that the Debtor exploited the barren language of the Indenture and seeks to bridge any gap in the terms of the Indenture by invoking the doctrine of good faith and fair dealing. There is no question that the covenant of good faith and fair dealing is a fundamental part of New York contract law. This covenant, implied in all contracts, "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989); *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933).

Nothing in the doctrine of good faith and fair dealing allows a court to create contract terms that the parties have not negotiated for. The implied covenant will only aid and further the explicit terms of the agreement and will never impose an obligation "which would be inconsistent with other terms of the contractual relationship." *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 335, 514 N.Y.S.2d 209, 212, 506 N.E.2d 919, 922 (1987); *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 246 F. Supp.2d 231, 256 (S.D.N.Y. 2002), *cert. denied*, 543 U.S. 1177, 125 S.Ct. 1309, 161 L.Ed.2d 161 (2005) ("[t]he implied covenant cannot prevent a party from exercising a right that it has specifically been accorded pursuant to the contract"); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 679 (S.D.N.Y. 1991) ("[t]he parties' contractual rights and liabilities may not be varied, not their terms eviscerated, by a claim that one party has exercised a contractual right but has failed to do so in good faith"); *In re Downtown Athletic Club of New York City, Inc.*, 1998 WL 898226 at *11 (Bankr. S.D.N.Y. 1998) ("[a] party can exercise its rights under a contract for any reason it finds satisfactory and such act will not constitute a breach of the implied covenant of good faith and fair dealing"). Under New York law, a party does not violate the implied

covenant "by acting in its own self interest consistent with its rights under a contract * * * *even when such conduct is allegedly unreasonable.*" *See Suthers v. Amgen, Inc.*, 441 F. Supp.2d 478, 485 (S.D.N.Y. Apr. 19, 2006) (emphasis added); *M/A-Com Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) ("the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract").

While the Court is not unsympathetic to the Noteholders' arguments, the Court must look to the actual terms of the contractual arrangement between the parties and not equity to determine this matter. None of the testimony or factual findings this Court has made warrant looking beyond the Indenture itself to determine its proper interpretation. Other courts that have been confronted with similar types of claims from bondholders who have lost the value of their bonds, most notably in the leveraged buy-out context, have likewise relied on the actual language of the controlling indenture. Those courts have explored the absence of protective provisions in the indentures and have declined to read into indentures provisions and protections that are not there. *See Metropolitan Life Insurance Company v. RJR Nabisco, Inc.*, 716 F. Supp. 1504 (S.D.N.Y. 1989); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989).[16]

For example, in *Metropolitan Life*, the bondholders of the RJR Nabisco Company ("RJR Nabisco") sued the company, for among other things, a breach of the implied covenant of good faith and fair dealing when RJR Nabisco agreed to a $24 billion leveraged buyout ("LBO") that reduced the investment quality of their bonds to near "junk" status. *Id.* at 1505-06. The

---

[16] Issues under the securities laws have also been raised in those cases. Those issues are not present here.

23

bondholders claimed that RJR Nabisco violated an implied covenant not to incur the debt necessary to facilitate the LBO and thereby betray what the bondholders claimed was the fundamental basis of their bargain with the company. *Id*. at 1507.   The indenture at issue in *Metropolitan Life* contained no explicit provision which either permitted or prohibited an LBO. *Id*. at 1515.

There was no express covenant in the bond indentures restricting the incurrence of new debt in structuring the LBO.  The District Court refused to imply a covenant to prevent the transaction, stating that to do so would be tantamount to creating indenture terms that the parties did not bargain for. *Id*. at 1508.  In so holding, the District Court discussed in great detail the history of bond indentures and why the market should dictate their terms rather than the courts:

> "The bonds implicated by this suit are governed by long, detailed indentures, which in turn are governed by New York contract law. No one disputes that the holders of public bond issues, like the plaintiffs here, often enter the market after the indentures have been negotiated and memorialized.  Thus, those indentures are often not the product of face-to-face negotiations between the ultimate holders and the issuing company.  What remains equally true, however, is that underwriters ordinarily negotiate the terms of indentures with the issuers.  Since the underwriters must then sell or place the bonds, they necessarily negotiate in part with the interests of the buyers in mind.  Moreover, these indentures were not secret agreements foisted upon unwitting participants in the bond market.  No successive holder is required to accept or to continue to hold the bonds, governed by their accompanying indentures; indeed plaintiffs readily admit that they could have sold their bonds right up until the announcement of the LBO.* * * Instead, sophisticated investors like plaintiffs are well aware of the indenture terms and, presumably, review them carefully before lending hundreds of millions of dollars to any company."

*Id.* at 1509.  The District Court went on to state that such indentures "were not born in a vacuum. They are descriptions of, and responses to, the market in which investors * * * knowingly participated." *Id*., at 1513.

24

Similarly, in *Hartford Fire*, the bondholders of Federated Department Stores ("Federated") sued the company for among other things, breach of the covenant of good faith and fair dealing when the company allowed itself to be acquired in an LBO which essentially destroyed the investment quality of the bonds. The underlying indenture expressly allowed Federated to merge with other companies and to incur additional debt. The bondholders argued that the indenture permitted only "traditional mergers" and debt incurred "in the ordinary course of business." 723 F. Supp. at 992. The District Court refused to imply a covenant to prevent the transaction and stated that "nothing in the Indenture supports this distinction between 'good' and 'bad' mergers or 'ordinary' and 'extraordinary' debt and that permitting courts to weigh the virtues of such transactions on a case-by-case basis threatens to inject an impermissible degree of uncertainty into the bond market." *Id*. at 992. The Court went on to state that "[u]niformity in interpretation is important to the efficiency of capital markets * * * the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets." *Id. quoting*, *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982), *cert. denied*, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983).

The two principal cases on which the Indenture Trustee relies, *Van Gamert v. Boeing Co.*, 520 F.2d 1373 (2d Cir. 1975) *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975) and *Pittsburgh Terminal Corp. v. Baltimore & Ohio R. Co.*, 680 F.2d 933 (3d Cir. 1982) are inapposite. Both cases dealt with indentures which required notice to bondholders of certain actions but the companies provided notice in a manner deliberately calculated to ensure the bondholders would not receive it. Both courts implied the covenant of good faith and fair dealing in order to

25

flesh out express contract rights set forth in the controlling indentures and related documents.  *See Van Gamert*, 520 F.2d  at 1385 ("[a]ny loss occurring to [the bondholders] * * * is not from a risk inherent in [their] investment but rather from unsatisfactory notice procedures"); *Pittsburgh Terminal,* 680 F.2d 941 (in a 2-1 decision with 3 opinions where the majority agreed only that the conduct complained of violated Rule 10b-17 of the federal securities laws, the court implied the covenant of good faith and fair dealing where defendant railroad "took steps to prevent the Bondholders from receiving information which they needed in order to receive the fruits of their conversion option should they choose to exercise it").  Other cases cited by the Indenture Trustee are similarly distinguishable on the ground that the implied covenant was used to enforce specific contract rights.  *See, e.g., Don King Prods. Inc. v. Douglas*, 742 F. Supp. 741, 767-68 (S.D.N.Y. 1990); *Greenwich Village Associates v. Salle,* 110 A.D.2d 111, 493 N.Y.S.2d 461 (1st Dep't . 1985)*; Kirke La Shelle Co.*, 263 N.Y. at 90.

The Noteholders urge that the purpose of an "equal and ratable clause" is to protect bondholders in the event of the corporation's slide towards insolvency.  Whether or not that is the general purpose of  "equal and ratable" clauses, the actual language of the Indenture does not protect the Noteholders against the risk of the Debtor's insolvency for several reasons.  The Indenture has no financial covenants running in favor of the Noteholders, other than the Equal and Ratable Clause.  The Indenture's Events of Default do not concern the state of the Debtor's balance sheet or its various ratios in the way that a loan agreement might.  The Indenture does not prohibit the Debtor from incurring or obtaining any amount of unsecured debt without having to grant an Equal and Ratable Lien.  Indeed, the Debtor, from the outset of its existence, had unsecured debt and was saddled with unquantifiable Legacy Liabilities for environmental claims, pensions and health and

welfare plans. There is nothing in the Indenture to prevent the Debtor from investing in new ventures, as this Debtor did, or operating its various businesses as it sees fit.  Only if the Debtor needs or chooses to borrow money secured by certain collateral defined in the Indenture of a value of 15 percent or more of its CNTA are the Noteholders entitled to a Equal and Ratable Lien.

Like the courts in *Metropolitan Life* and *Hartford Fire,* this Court is confronted with an Indenture which does not contain an explicit provision prohibiting the Debtor's actions.  And like the courts in *Metropolitan Life* and *Hartford Fire*, this Court will not read into an indenture with a plain and clear meaning the vague and unclear implied covenant that the Noteholders desire.  The Debtor is entitled to the benefit of the "terms of the negotiated contract to the letter without being mulcted  for lack of good faith: express covenants abrogate the operation of implied so courts will not permit implied agreements to overrule or modify the express contract of the parties." *In re Kaplan*, 143 F.3d 807, 818 (3d Cir. 1998).  The Court therefore holds that the express language of the Indenture gave the Debtor the right to release the Equal and Ratable Liens.

**The Debtors Did Not Undertake Corporate Acts
in Furtherance of a Commencement of Bankruptcy**

The Indenture Trustee and the Noteholders also argue that the release of the Equal and Ratable Liens under the Intercreditor Agreement was improper without the consent of the Noteholders because a Triggering Event had occurred prior to the release.  The Intercreditor Agreement prohibits the release of Equal and Ratable Liens without Noteholder consent only when "* * * a Triggering Event has occurred and is continuing."  *Intercreditor Agreement* ¶ 7.02(b).  The Indenture Trustee argues that the incorporation of SBE for the purpose of venue in this District, constitutes a Triggering Event under the Intercreditor Agreement and an Event of Default under the

27

Indenture because the Debtor took "corporate action* * * in furtherance of bankruptcy." Intercreditor Agreement §1(a); *Indenture* at §501(6).

There appear to be few cases that have considered what the phrase "corporate acts in furtherance of the commencement of a bankruptcy" means. Only two were cited by Debtor's counsel in the opinion letter given to the Collateral Trustee in connection with the release of the Equal and Ratable Lien. *Gibson Dunn Opinion Letter,* p.5 . One is a decision of this Court written over twenty years ago, *In re Revere Copper & Brass, Inc.*, 60 B.R. 887, 890 (Bankr. S.D.N.Y. 1985). In *Revere*, this Court stated, in *dicta*, that an actual board of directors resolution to file was required and found that "contingency planning and discussions prior thereto do not rise to the level of corporate action." *Id.* at n.1. This analysis comports with the due authorization requirements of corporate law. The Local Rules in this District have likewise required that a certificate reflecting the Board resolution to file accompany the petition. *See* Local Bankruptcy Rule 1074-1(a). The other case was *Union Bank of Switzerland v. Deutsch Fin. Servs. Corp.*, 2000 WL 178278 at *11-12 (S.D.N.Y. February 16, 2000). In *Union Bank*, the court similarly concluded that a company did not take corporate action by discussing the possibility of a bankruptcy filing or retaining counsel where the "Board did not implement or authorize any action." *Id*.

The paucity of cases leads this Court to believe that its conclusion in *Revere* remains the correct interpretation of this term. If more was meant, this term would be more heavily negotiated. While the word "action" can mean several different things, the phrase "corporate action" has a distinct meaning. A corporation acts through its board of directors. The board of directors act by passing resolutions and by appointing officers to whom it delegates certain, but necessarily limited, authority. Until authorized by the Board of Directors, no officer of the Debtor had the

28

authority to sign and file a Chapter 11 petition. The corporate action of authorizing the Chapter 11 filing did not occur until December 16, 2003. All other activities undertaken by the Debtor, including Board authorization to enter into the Abelco I Loan, incorporating SBE and general contingency planning, do not amount to "corporate action" in furtherance of a bankruptcy filing within the meaning of the Indenture or the Intercreditor Agreement. Therefore, the Court finds that there had been no Triggering Event under the Indenture or the Intercreditor Agreement at the time the Equal and Ratable Lien was released and the consent of the Indenture Trustee was not required.

**The Abelco I and Abelco II Loans Were Separate Transactions**

Finally, it is argued on behalf of the Noteholders that the Abelco I Loan and the Abelco II Loan should be viewed as a single transaction - - that is, two components of a single loan. From this rationale, it would arguably follow that the Notes were never desecured since collectively Abelco I and II required collateral in excess of 15 percent of the CTNA. The Court finds that as a matter of fact, the two financings were separate and independent transactions.

The Debtor had many legitimate reasons to replace the over-secured Amended Credit Facility with the Abelco I Loan. It allowed for a reduced collateral package and a longer maturity, it cured imminent financial covenant defaults under the Amended Credit Facility and it capped and restructured the Astaris Keepwell Payments.

The Debtor does not dispute that on the date that the Abelco I Loan closed it was engaged with the Abelco lenders in preliminary negotiations for additional financing on either an in or out of court basis. However, the Abelco I Loan did not obligate or require the Debtor to obtain additional financing from the Abelco lenders nor were the Abelco lenders obligated or required to provide additional financing to the Debtor. While it was more likely than not that the Debtor would

29

need additional financial assistance beyond the terms of the Abelco I Loan, that financial assistance was not limited to the possibility of Abelco II.  The Debtor pursued other options including loans from other sources as well as financial relief from New Monsanto and Pharmacia, other forms of restructuring its debt and the sale of some of its assets.[17]

The Court therefore declines to collapse the two transactions.

## CONCLUSION

For the reasons set forth above, the Court holds that the Noteholders do not have, and are not entitled to, an Equal and Ratable Lien on any of the Debtor's assets.  The Notes were properly de-securitized under the express terms of the Indenture and its related agreements and the Noteholders are therefore not entitled to any equitable relief.

Settle Order.

Date: New York, New York
    May 1, 2007

/s/ Prudence Carter Beatty
United States Bankruptcy Judge

---

[17] The Court notes that during the period between the two Abeclo Loans, the Debtor kept current on its outstanding obligations until the non-payment of New Monsanto in early December. The Debtor made a $16.1 million interest payment to the Noteholders on October 15, 2003 - - less than a week after the Abelco I Loan closed.  Eric Siegert, the financial advisor to the Informal Committee testified that it would have made no sense for the Debtor to make this payment if it did not intend to restructure out of court. It should also not be forgotten that in late August and early September of 2003, the Debtor issued warrants to New Monsanto and stock options to its own management, which, as the former CFO of the Debtor testified, the Debtor would not have done if it had believed that the warrants and options were worthless.

30